## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ERICKY BOGUES, #327505, | * | |
| Plaintiff | * | |
| v. | * | Civil Action No. CCB-19-2035 |
| FRANK BISHOP, *Warden*, | * | |
| JAMIE FARRIS, | | |
| SGTC. WEDLOCK, | * | |
| LYNAE LLEWELLYN, | | |
| SHANE LARUE, | * | |
| CODY GILPIN, | | |
| JUSTIN BROADWATER, | * | |
| ASRESAHEGN GETACHEW, M.D., and | | |
| HOLLY HOOVER, | * | |
| Defendants | * | |

*** 

## <u>MEMORANDUM OPINION</u>

Self-represented plaintiff Ericky Bogues, currently incarcerated at North Branch Correctional Institution ("NBCI") in Cumberland, Maryland, brought this civil action pursuant to 42 U.S.C. § 1983 against Warden Frank Bishop, Adjustment Hearing Officer Jamie Farris, Correctional Sergeant Christopher Wedlock, Correctional Officer Shane Larue, and Lynae Llewellyn, LPN, alleging a violation of his due process rights.  ECF No. 1.  On August 2, 2019, plaintiff supplemented his complaint to add claims of retaliation against Correctional Officers Justin Broadwater and Cody Gilpin.  ECF No. 4.  On September 13, 2019, plaintiff filed another supplement, adding a claim of deliberate indifference to a serious medical need against the existing defendants, as well as Asresahegn Getachew, M.D., and Holly Hoover, N.P.[1] (formerly known as Holly Pierce).  ECF No. 10.  Plaintiff seeks monetary damages.  ECF Nos. 1, 10.

On December 18, 2019, defendants Bishop, Broadwater, Farris, Gilpin, Larue, and Wedlock (collectively, the "Correctional Defendants") filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 21), which plaintiff opposed (ECF Nos. 27, 28).  On July 9, 2020, Corizon

---

[1] The Clerk shall be directed to add Holly Hoover as a defendant.

Health employees Dr. Getachew and Llewellyn similarly filed a Motion to Dismiss or, Alternatively, for Summary Judgment (ECF No. 58), which plaintiff opposed (ECF No. 61).  On August 3, 2020, Wexford Health Sources, Inc. employees Hoover and Llewellyn[2] also moved to dismiss or for summary judgment. ECF No. 63.  Plaintiff was informed by the court, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), that the failure to file a response in opposition to the motion could result in dismissal of the complaint.  ECF No. 64.  Plaintiff filed nothing further to oppose the motion filed by Hoover and Llewellyn.

A hearing is not necessary.  *See* Local Rule 105.6 (D. Md. 2018).  For the reasons explained below, the court will grant defendants' motions.

## Background

### A.  Plaintiff's Allegations

Plaintiff claims that despite complaining to Warden Bishop and NBCI medical staff about knee pain for over a year, he did not receive surgery until October 18, 2018.  Second Supp., ECF No. 10 at 6-7. Following the procedure, he asked CO Broadwater and NP Hoover to place him on a lower level tier and to give him crutches but they denied his request, stating that he did not need crutches.  *Id.* at 2, 4, 10. Plaintiff also asked Nurse Llewellyn for crutches, but she denied them as well.  *Id.* at 2.  As a result, plaintiff's stitches from the surgery burst open and became infected.  *Id.* at 3.  According to plaintiff, NP Hoover falsified medical records and reported that plaintiff removed staples from his surgery; however, he had stitches and not staples.  *Id.* at 5.

Plaintiff also claims that Dr. Getachew failed to ensure that he received his pain medication as prescribed.  *Id.* at 2, 8.  On or about February 13, 2019, plaintiff submitted a sick call request for the pain

---

[2] Wexford was the contracted medical provider for inmates in the Maryland Department of Public Safety and Correctional Services until December 31, 2018.  Beginning January 1, 2019, Corizon Health replaced Wexford, and defendant Llewellyn continues to provide medical services on behalf of Corizon.  Thus, to the extent plaintiff raises claims against medical staff regarding events that took place before January 1, 2019, his claims are against Hoover and Llewellyn (collectively, the "Wexford Defendants").  To the extent he raises claims regarding events that took place on or after January 1, 2019, his claims are against Getachew and Llewellyn (collectively, the "Corizon Defendants").

medication Tramadol as recommended by his surgeon.  *Id.* at 6.  Despite NP Hoover's advice not to order it, Dr. Getachew told plaintiff that he would place the request; however, he never did so.  *Id.*

On January 25, 2019, Nurse Llewellyn wrote a false ticket against plaintiff, stating that he stopped her in the middle of medication distribution and "made a claim to rape her."  Compl., ECF No. 1 at 5. During the hearing on the rule violation, Hearing Officer Farris and Sgt. Wedlock denied plaintiff the opportunity to call Nurse Llewellyn as a witness, while CO Larue corroborated Nurse Llewellyn's report. *Id.* at 7-8.  Plaintiff was subsequently found guilty, and Warden Bishop affirmed the ruling.  *Id.* at 7. Plaintiff was subjected to revocation of 10 credits and placed in disciplinary segregation for 60 days, where he could not have a TV, fan, or access to phone calls.  *Id.*

Plaintiff filed the instant suit on July 10, 2019.  *See* ECF No. 1.  On August 2, 2019, he filed a supplement claiming that Officers Gilpin and Broadwater retaliated against him as a result of this action. Supp., ECF No. 4 at 2.  He states that on July 23, 2019, the officers called him a rat and threatened to mace and kill him or write another false ticket to have him returned to disciplinary segregation.  *Id.*  On July 25, 2019, Officers Gilpin and Broadwater, armed with a knife, came to his cell and threatened to kill him again, and on July 26, 2019, they placed cheese on his window and called him a rat.  *Id.* at 2-3.

## B.  Defendants' Response

### i.  Medical Claims

Plaintiff's medical records reflect that he underwent left knee surgery on October 19, 2018 to remove scar tissue and broken wires from a prior procedure.  Medical Records, ECF No. 60-1 at 64-67. The skin was closed using Vicryl sutures.[3]  *Id.* at 67.  Following the surgery, plaintiff was seen at chronic care clinic on October 25, 2018 and November 2, 2018, at which time NP Hoover noted that plaintiff requested a post-operation follow-up.  *Id.* at 5-8.  Nothing in the records reflects that plaintiff requested

---

[3]   Vicryl   or   Polyglactin   is   a   synthetic,   absorbable,   braided   suture.   *See* https://www.healthline.com/health/sutures (last visited Sept. 25, 2020).

crutches.  *See id.*  In addition, Nurse Llewellyn does not recall plaintiff expressing concerns regarding crutches after his surgery.  Decl. of Llewellyn, ECF No. 58-3 at ¶ 8.

On November 7, 2018, NP Hoover placed a request for follow-up with an orthopedic specialist. ECF No. 60-1 at 10.  During medical rounds on November 10, 2018, a nurse noted that plaintiff "want[ed] to know when staples can come out of surgical site to left knee."  *Id.* at 12.  During a chronic care visit on November 26, 2018, NP Hoover noted that plaintiff had removed the surgery staples prior to the visit.  *Id.* at 14-15.  NP Hoover also noted that plaintiff reported "doing jumping jacks, running in place, squats as well as many other exercise[s]."  *Id.* at 14.

Thereafter, plaintiff developed an infection at the surgical site.  *Id.* at 18.  During a provider visit on November 30, 2018, NP Hoover cleaned the wound and secured it with an ace wrap, educated plaintiff on wound care, and directed him not to remove the dressing.  *Id.*  The following day, plaintiff returned to the medical unit and reported that the area was improving.  *Id.* at 20.  He had removed the dressing because he wanted to exercise.  *Id.*  NP Hoover educated him again about the importance of keeping the dressing in place.  *Id.*  Plaintiff continued to remove the dressing and refused to complete his antibiotic treatment.  *See id.* at 23, 26.  He was monitored in the infirmary between December 24 and 27, 2018, and was discharged when the infection was resolved.  *See id.* at 37-59.  Following his discharge from the infirmary, plaintiff was seen for wound care of his left knee four times between January 1, 2019 to January 14, 2019.  Medical Records, ECF No. 58-4 at 53-61.  He continued to be non-compliant with his medication regimen and wound care.  *Id.* at 56.

On February 13, 2019, plaintiff had a follow-up visit with the orthopedic surgeon.  *Id.* at 179-80. The orthopedist noted that plaintiff's wound was almost healed, and he recommended physical therapy and a knee brace.  *Id.*  In addition, the orthopedist noted that plaintiff "can be on Tramadol . . . for pain."  *Id.*

On February 18, 2019, NP Hoover reviewed the orthopedist's recommendation and ordered a knee brace.  *Id.* at 80.  NP Hoover also requested a physical therapy consultation and continued plaintiff's Naproxen prescription for pain, noting that plaintiff was able to exercise without difficulty, including squats

4

and burpees.  *Id.*  On February 26, 2019, plaintiff was issued a knee brace, and on March 15, 2019, he began physical therapy.  *Id.* at 8, 88.  For the remainder of March 2019, plaintiff walked without difficulty to his appointments.  *Id.* at 89-93.  Plaintiff complained of pain but did not need an assistive device to walk.  *Id.*

On April 1, 2019, Dr. Getachew saw plaintiff in chronic care and noted plaintiff's history of hypertension, chronic left knee pain, multiple surgeries to his left knee, and antisocial personality disorder. *Id.* at 97-98.  Plaintiff demanded Tramadol or Neurontin for his chronic pain.  *Id.*  In response, Dr. Getachew referred plaintiff to the multidisciplinary pain management team to address his request for chronic pain medication.  *Id.*

Plaintiff continued physical therapy.  *Id.* at 99-104.  On April 15, 2019, Dr. Getachew saw Plaintiff in chronic care, at which time plaintiff continued to complain of pain.  *Id.* at 109-11.  Dr. Getachew recommended continuation of physical therapy and use of a knee brace, and prescribed Tramadol through June 15, 2019.  *Id.*

Dr. Getachew saw plaintiff again on April 24, 2019.  *Id.* at 112-13.  Dr. Getachew noted that he had initially ordered Tramadol but, after reviewing plaintiff's record, found that plaintiff had "been on Tramadol for many years" and was able to exercise without medication.  *Id.*  Dr. Getachew states that Tramadol is an opioid-like pain medication, and one of its serious and common side effects is psychological and physical addiction.  Decl. of Getachew, ECF No. 58-5 at ¶ 5.  The longer one uses the opioid medication, the less effective and more dangerous that medication becomes.  *Id.*  Thus, long-term pain management with pain relievers such as Tramadol is generally not appropriate, particularly in the prison setting where the potential for abuse, misuse, and diversion of this medication is significant.  *Id.* at ¶ 6.  Dr. Getachew instead prescribed Nortriptyline, an antidepressant that can be used to treat musculoskeletal pain, and advised plaintiff that the medication would not remove all pain.  ECF No. 58-4 at 112-13.

Plaintiff had physical therapy through May 9, 2019 and reported an improvement in pain levels.  *Id.* at 114-18.  On July 12, 2019, plaintiff complained of left knee pain, and on July 15, 2019, he requested Neurontin.  *Id.* at 129-33.  During a chronic care visit on August 7, 2019, plaintiff reported that he is non-

compliant with his cardiovascular medication regimen and chooses to focus on his diet and exercise. *Id.* at 136. Plaintiff stated that he works out for 1-2 hours daily, doing burpees, squats, planks, and sit-ups. *Id.* He reported unresolved pain in his knee and requested Tegretol or Neurontin. *Id.* NP Hoover noted that plaintiff had previously been prescribed each medication but was not taking either. *Id.* Plaintiff claimed that he would "take it this time" and demanded to see the on-site medical doctor as "[h]e gives the candy." *Id.*

Plaintiff returned to the medical department with complaints of knee pain several times between October 2019 and January 2020. *Id.* at 143-64. Providers noted swelling in plaintiff's knee but found that plaintiff walked without difficulty and was able to bear his body weight on his left leg independently. *Id.* A special shoe was ordered to help alleviate his pain. *Id.* at 159-64. During a chronic care visit on March 16, 2020, it was noted that plaintiff had flat feet and may benefit from orthotics. *Id.* at 174-76. An x-ray was ordered, and a referral to a podiatrist was submitted. *Id.* Plaintiff continued to be evaluated for his left knee complaints through May 2020. *Id.* at 186-93; ECF No. 58-5 at ¶¶ 57-61.

### ii. Due Process & Retaliation Claims

On January 25, 2019, Nurse Llewellyn was performing medical rounds in Housing Unit One while escorted by CO Larue. Notice of Inmate Rule Violation, ECF No. 21-3 at 3. At around 7:50 a.m., Nurse Llewellyn approached plaintiff's cell and CO Larue opened the cell door slot for Nurse Llewellyn to administer plaintiff's medication. *Id.* Plaintiff looked at Nurse Llewellyn and said, "Do you want to take a ride on the train?" *Id.* Nurse Llewellyn told Plaintiff that it was none of his business, and plaintiff then yelled, "Bitch, your sex life is my mother fucking business and how about I just rape your ugly ass!?" *Id.* Nurse Llewellyn immediately walked away from the cell door while plaintiff refused to allow CO Larue to secure the cell door slot. *Id.* She states that plaintiff's actions caused a delay in the distribution of medication to the rest of the housing unit. *Id.* Nurse Llewellyn filed a Notice of Inmate Rule Violation ("NOI") on the same day. *Id.* CO Larue also provided a written statement consistent with the information on Nurse Llewellyn's report. *Id.* at 5.

6

Following the incident, plaintiff was charged with violating the following rules:

104:    making threats that include using physical harm to individuals
116:    possessing misusing, tampering with, damaging, or destroying security equipment or
        property, detection equipment, or fire suppression equipment or alarm
312:    interfering with or resisting search of a person, item, area, or location, causing the
        early return of a community detail due to a violation of the rules, or committing any
        inmate rule violation outside of the confinement of a secure facility
410:    demonstrating disrespect, insolence, or use of vulgar language, and disobeying a
        specifically cited facility Category IV rule

*Id.* at 3.  The recommended rule violations were reviewed by the Shift Supervisor and approved for a Formal

Hearing.  *Id.*

A hearing for the rule violations was held on February 5, 2019.  *Id.* at 8.  Sgt. Wedlock served as

the Facility Representative and Hearing Officer Farris presided.  *Id.*; Decl. of Wedlock, ECF No. 21-6 at ¶

3.  According to the Inmate Hearing Record, plaintiff requested Nurse Llewellyn and CO Larue to appear

as witnesses, and Sgt. Wedlock did not object.  Notice of Inmate Rule Violation, ECF No. 21-3 at 8.

Plaintiff proffered that if called to testify, Nurse Llewellyn would say "[t]hat I said what she said I said"

but he did not claim that she would help his case.  *Id.*  Hearing Officer Farris denied plaintiff's request

because the requested witnesses' statements would not differ from their reported statements.  *Id.* at 10.

Plaintiff testified that on the day of the incident, he asked Nurse Llewellyn "how many officers have

tried to take a ride on your train," and she said it was none of his business.  *Id.* at 9.  Plaintiff said that Nurse

Llewellyn and CO Larue then walked away before they could give him his medication.  *Id.*  He claimed

that he kept his arm in the slot because he did not get his medication.  *Id.* at 10.  Plaintiff also testified that

Nurse Llewellyn filed a false claim, and he stated that he "never had a rape charge in my life, I have never

had a ticket saying that I would rape women."  *Id.*

After reviewing the reports and hearing plaintiff's testimony, Hearing Officer Farris found Nurse

Llewellyn's NOI to be credible and reliable.  *Id.* at 10.  Hearing Officer Farris noted that plaintiff admitted

to asking Nurse Llewellyn the personal question and placing his arm out of the slot as she was leaving.  *Id.*

Concluding that plaintiff was disrespectful, Hearing Officer Farris found him guilty of all four charges and

sentenced him to 60 days of segregation and loss of 10 days of diminution credits. *Id.* at 10-11. Plaintiff's appeal of the hearing decision was reviewed and affirmed by a warden designee. *Id.* at 16.

Officers Broadwater and Gilpin both state that they were not aware, until they were served with the complaint and supplemental complaint in August 2019, that plaintiff filed his lawsuit. Decl. Broadwater, ECF No. 21-7 at ¶ 3; Decl. of Gilpin, ECF No. 23-1 at ¶ 3. They aver that they did not retaliate in any manner against plaintiff, nor did they threaten him or call him a rat. ECF No. 21-7 at ¶¶ 3, 4; ECF No. 23-1 at ¶¶ 3, 4. In addition, CO Broadwater states that correctional staff are strictly prohibited from possessing or carrying knives or weapons, and they are subject to metal detection and a pat down search when reporting for duty. ECF No. 21-7 at ¶ 5.

Warden Bishop states that he expects the NBCI staff to comply with the Directives and NBCI policies regarding inmate housing, security classifications, inmate rule violations, and adjustment hearings. Decl. of Bishop, ECF No. 21-9 at ¶ 3. When responding to an inmate's appeal of his adjustment hearing conviction, Warden Bishop relies on staff designee review of the Inmate Hearing Record and Sentencing Matrix to render a response to the appeal. *Id.* at ¶ 4.

Plaintiff filed Administrative Remedy Procedure ("ARP") requests in ARP No. NBCI-260-19 and ARP No. NBCI-309-19, alleging respectively that Nurse Llewellyn filed a false rule violation claim and that he was found guilty at the resulting adjustment hearing. ECF No. 21-3 at 27. Both ARPs were dismissed. *Id.* According to the Commissioner of Correction's Office, plaintiff did not file an appeal from either ARP. Decl. of Eboné Janifer, Executive Assistant, ECF No. 21-11 at ¶ 3.

Plaintiff's ARP Index summary does not include any indication that Plaintiff filed an ARP request regarding his allegations against Officers Broadwater and Gilpin. ECF No. 21-3 at 27. The Inmate Grievance Office ("IGO") states that plaintiff filed a relevant grievance, IGO Case No. 20190282, in which he alleged that Nurse Llewellyn and CO Larue filed false rule violation charges against him following the January 25, 2019 incident. Decl. of Samiyah Hassan, IGO Administrator, ECF No. 21-10 at ¶¶ 2-3. He did not file grievances in relation to his other claims. *See id.*

8

**Standards of Review**

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).

Rule 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48 (emphasis in original). The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam) (citation and quotation omitted), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted). *See also Jacobs v. NC. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

9

**Analysis**

## I.    Warden Bishop

Section 1983 provides that a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983.  Section 1983, however, "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *Wahi v. Charleston Area Med. Ctr.*, 562 F.3d 599, 615 (4th Cir. 2009).

Plaintiff seeks to hold Warden Bishop liable in his capacity as a supervisor, in particular for affirming Hearing Officer Farris's finding that plaintiff violated four institutional rules.  It is well established, however, that the doctrine of respondeat superior does not apply in § 1983 claims.  *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (holding that there is no respondeat superior liability under § 1983).  Rather, liability of supervisory officials is "premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'"  *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).

To establish supervisory liability under § 1983, a plaintiff must show that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.  *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted).  "A single act or isolated incidents are normally insufficient to establish supervisory inaction upon which to predicate § 1983 liability."  *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983)

(footnote and citations omitted).

Plaintiff has failed to plead or demonstrate sufficient facts showing supervisory indifference to, or tacit authorization of, any misconduct by Warden Bishop's staff.  He summarily states that Warden Bishop improperly affirmed the sanctions imposed upon him following a formal institutional hearing.  Plaintiff's assertion regarding this single event does not demonstrate a pattern of widespread abuse necessary to establish supervisory action or inaction giving rise to § 1983 liability.  *See id.* ("Generally, a failure to supervise gives rise to § 1983 liability, however, only in those situations in which there is a history of widespread abuse.").  Therefore, plaintiff's claims against Warden Bishop shall be dismissed.

## II.    Correctional Defendants

The Correctional Defendants raise the affirmative defense that plaintiff has failed to exhaust his administrative remedies as to all of his claims.  Corr. Motion, ECF No. 21-1 at 12-13.  If plaintiff's claims have not been properly presented through the administrative remedy procedure, they must be dismissed pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e.

The PLRA provides in pertinent part that:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."  42 U.S.C. § 1997e(h).  The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003), *aff'd*, 98 Fed. App'x 253 (4th Cir. 2004).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner.  Rather, the failure to exhaust administrative

remedies is an affirmative defense to be pleaded and proven by defendants.  *See Jones v. Bock*, 549 U.S. 199, 215-16 (2007); *Anderson v. XYZ Corr. Health Servs., Inc*., 407 F.3d 674, 682 (4th Cir. 2005). Nevertheless, a claim that has not been exhausted may not be considered by this court.  *See Bock*, 549 U.S. at 220.  In other words, exhaustion is mandatory, and a court usually may not excuse an inmate's failure to exhaust.  *Ross v. Blake*, 578 U.S. __, 136 S.Ct. 1850, 1857 (2016).

The Maryland Department of Public Safety and Correctional Services has made an ARP available to Maryland State prisoners for "inmate complaint resolution."  *See generally* Md. Code (2008 Repl. Vol.), Correctional Services Article ("C.S."), §§ 10-201 *et seq.*; Code of Maryland Regulations ("COMAR") 12.07.01.01B(1) (defining ARP).  If the ARP is denied, the prisoner has 30 days to file an appeal with the Commissioner of Correction.  If the Commissioner of Correction denies an appeal, the prisoner has 30 days to file a grievance with the IGO.  OPS.185.0002.05D; C.S. § 10-206(a); C.S. § 10-210; COMAR 12.07.01.05B.  When filing with the IGO, a prisoner is required to include copies of the following: the initial request for administrative remedy, the Warden's response to that request, a copy of the ARP appeal filed with the Commissioner of Correction, and a copy of the Commissioner's response.  COMAR 12.07.01.04(B)(9)(a).  If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing.  C.S. § 10-207(b)(1); *see* COMAR 12.07.01.07B.  An order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review.  C.S. § 10-207(b)(2)(ii).

Here, it appears that plaintiff was aware of the Inmate Grievance Procedure and the process was available to him.  However, nothing in the record suggests that he completely pursued his administrative remedies with regard to the claims he now raises.  Although plaintiff filed ARPs alleging that Nurse Llewellyn submitted a false report and challenging the guilty finding at the resulting adjustment hearing, he did not file an appeal from either ARP when they were dismissed.  In addition, plaintiff only filed a single grievance with the IGO regarding Nurse Llewellyn and CO Larue's actions.

As discussed above, the PLRA requires that inmates exhaust all available remedies.  Because

12

plaintiff failed to do so, his claims against the correctional defendants shall be dismissed without prejudice.[4]

### III.    Corizon and Wexford Defendants

The Corizon and Wexford Defendants' motions are styled as motions to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.   A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.   *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Conversion of a motion to dismiss to one for summary judgment under Rule 12(d) is permissible where plaintiff has "actual notice" that the motion may be disposed of as one for summary judgment.   *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260-61 (4th Cir. 1998).   When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious."   *Laughlin*, 149 F.3d at 261.

Because the Corizon and Wexford Defendants filed motions titled as motions to dismiss or for summary judgment along with documents in support, plaintiff was on notice that the court could treat the motions as ones for summary judgment and rule on that basis.   Accordingly, the court will review plaintiff's claims against the Corizon and Wexford Defendants under the Rule 56(a) standard.

To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendant, or the defendant's failure to act, amounted to deliberate indifference to a serious

---

[4] In any event, to the extent plaintiff alleges a violation of his due process rights based on the NOI, hearing, and resulting sentence, his claim fails.   Plaintiff received notice of the rule violations, was provided an opportunity to be heard, *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974), and was given a written decision, *Baxter v. Palmigiano,* 425 U.S. 308, 322, n.5 (1976), based upon some evidence, *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 455 (1985).   The NOI and statement provided by CO Larue at the adjustment hearing suffices as "some evidence." His confinement to disciplinary segregation following the hearing was not a "significant hardship . . . in relation to the ordinary incidents of prison life."   *Sandin v. Conner*, 515 U.S. 472, 484 (1995).   To the extent plaintiff alleges a constitutional violation based on Officers Broadwater's and Gilpin's verbal threats, his claim also fails.   Verbal abuse of inmates by guards, without more, states no claim of assault.   *Henslee v. Lewis*, 153 Fed. App'x 178, 180 (4th Cir. 2005); *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979).

medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical

need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and

that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide

it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834-37 (1994); *see also Heyer v. U.S.

Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir.

2016); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must

be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be

provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).

"A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one

that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"

*Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th

Cir. 2016) (failure to provide diabetic inmate with insulin where physician acknowledged it was required

is evidence of objectively serious medical need).

After a serious medical need is established, a successful Eighth Amendment claim requires proof

that the defendants were subjectively reckless in treating or failing to treat the serious medical condition.

*See Farmer*, 511 U.S. at 839-40. Under this standard, "the prison official must have both 'subjectively

recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate

in light of that risk.'" *Anderson v. Kingsley*, 877 F.3d 539, 545 (4th Cir. 2017) (quoting *Parrish ex rel. Lee

v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir.

1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct

is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter

. . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge

of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105

(4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met

through direct evidence of actual knowledge or through circumstantial evidence tending to establish such

knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

Here, even assuming that plaintiff's knee condition while at NBCI was sufficiently severe that it created a serious medical need for Eighth Amendment purposes, the record does not support a finding that the Corizon or Wexford Defendants acted with deliberate indifference to that need. Plaintiff claims that he complained about knee pain for over a year before receiving surgery, but he provides no additional information, such as sick call requests, to support his assertion. Likewise, nothing in plaintiff's medical records indicates that he requested crutches following his surgery. Rather, medical providers stated that within a month following his procedure, plaintiff reported running in place and doing jumping jacks and other exercises. The medical records also do not support plaintiff's assertion that the lack of crutches caused his surgical wound to become infected. Instead, several nurses' notations reflect that plaintiff removed the surgical closure,[5] repeatedly removed the dressing so that he could exercise, and refused to complete his antibiotic treatment.

In addition, Dr. Getachew's decision not to provide plaintiff with Tramadol was not inappropriate as plaintiff alleges. Although the orthopedist advised that plaintiff "can be on Tramadol . . . for pain," he did not state that it was the only appropriate pain medication. After reviewing plaintiff's medical records and learning that plaintiff was able to exercise without medication, Dr. Getachew determined that another type of pain reliever would be better suited since Tramadol can cause psychological and physical addiction, and could become less effective and more dangerous long-term. To the extent that plaintiff merely disagrees with Dr. Getachew's decision, he fails to state a valid claim under § 1983. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) ("Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged.") (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)).

---

[5] The fact that medical staff mistakenly referred to plaintiff's sutures as staples instead of stitches is of no consequence.

Viewing the evidence in the light most favorable to plaintiff, there is no indication that the Corizon or Wexford Defendants ignored his complaints of pain.  In the course of treating plaintiff, the medical staff provided wound care, routinely scheduled chronic care visits, provided physical therapy, placed specialist referrals, and recommended special shoes and orthotics.  Therefore, plaintiff has not shown that the Corizon or Wexford Defendants exhibited a callous disregard for his serious medical need, *see Estelle*, 429 U.S. at 105-06, and they are entitled to summary judgment on this claim.

### Conclusion

Plaintiff's claims against Warden Bishop are dismissed.  Plaintiff's claims against the remaining Correctional Defendants are dismissed without prejudice.  The Corizon and Wexford Defendants' Motions, construed as motions for summary judgment, are granted.


A separate Order follows.


____9/28/20_____                      _____/S/_____
Date                                                         Catherine C. Blake
                                                                United States District Judge